# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| KATRINA BRADLEY, ) | |
| ) | |
| Plaintiff, ) | Civil Action No.: ____ |
| ) | |
| v. ) | |
| ) | |
| ) | COMPLAINT |
| SEAN J. STACKLEY, ACTING SECRETARY OF THE ) | |
| NAVY, ) | |
| ) | |
| ) | |
| Defendant. ) | |
| ) | March 27, 2017 |

Plaintiff Katrina Bradley, through counsel, alleges the following facts upon information and belief:

## INTRODUCTION

1.      In 1994, at the age of eighteen, Plaintiff Katrina Bradley enlisted in the United States Navy. Ms. Bradley is an African American woman who identifies as gay.  She knew that she would be a minority in the Navy, but she did not expect the Navy to discriminate, harass, and retaliate against her for the differences that set her apart.

2.      Navy airmen racially profiled and sexually harassed Ms. Bradley during her service. When she filed a harassment complaint, her harasser and others in her chain of command threatened and retaliated against her. Within a year, her command forced her out of the Navy with a stigmatizing Other Than Honorable (OTH) discharge.

3.      Years later, Ms. Bradley retained *pro bono* counsel and applied for a discharge upgrade to the Board for Correction of Naval Records (BCNR), an agency created by Congress to correct an "error or injustice" in the discharge process. In a formulaic decision, the BCNR

1

rejected her application, failing to acknowledge evidence in the record, neglecting to respond to all of Ms. Bradley's arguments, and violating a military whistleblower statute and the BCNR's own regulations. In doing so, it contravened the Administrative Procedure Act and the Due Process Clause of the Fifth Amendment.

4.      Ms. Bradley asks the Court to set aside the BCNR's unlawful decision and grant her a discharge upgrade to finally correct the injustice of her OTH discharge.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under the Fifth Amendment to the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 706.

6.      Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C) as Plaintiff Bradley resides in the District of Connecticut, the action involves no real property, and Defendant Sean J. Stackley is sued in his official capacity as an Officer of the United States.

## PARTIES

7.      Plaintiff Katrina Bradley is a veteran of the United States Navy. She is a citizen of the United States and currently resides in Connecticut.

8.      Defendant Sean J. Stackley, Acting Secretary of the Navy, is sued in his official capacity. Defendant is empowered to act through the BCNR to change any military record of a former member of the Navy whenever necessary to correct an error or to remove an injustice.

## FACTS AND PROCEEDINGS

### *Enlistment and Service at Naval Air Station Brunswick*

9.      In May 1994, one month before her high school graduation, Ms. Bradley enlisted in the Navy.

10.     She had grown up hearing about her father's experience in the U.S. Air Force and

was close to a cousin who had enlisted in the Navy. She hoped her enlistment would make her father proud.

11.     She committed herself to serving for eight years in the Naval Reserve with three years active in the Airman Apprentice Training Program.

12.     Ms. Bradley began her basic training in October 1994 at the Great Lakes Naval Air Station near Chicago, Illinois. She was happy in basic, where she was surrounded by a diverse cohort of fellow recruits and supported by a general spirit of camaraderie.

13.     Ms. Bradley successfully completed basic training in February 1995.

14.     That same month, Ms. Bradley reported for duty at Patrol Squadron Ten at Naval Air Station (NAS) Brunswick, in Brunswick, Maine. She served as a hazardous materials (HAZMAT) clerk, and her primary duties involved checking materials in and out.

15.     This move was a culture shock for Ms. Bradley. Unlike her hometown, her high school, and basic training, NAS Brunswick was an almost entirely white community.

16.     Furthermore, Ms. Bradley, who is gay, knew that the military's Don't Ask Don't Tell (DADT) policy, implemented in 1993, required her to hide her sexual orientation.

17.     Having to hide a central part of her identity was emotionally difficult for Ms. Bradley, as she had been open about her sexual orientation in high school, but her passion to serve compelled her to enlist nonetheless.

18.     Isolated, Ms. Bradley sought out people who would accept her. During one off-duty weekend from NAS Brunswick, she met Khairah Walker.

19.     Ms. Walker and Ms. Bradley became close friends and, eventually, romantic partners. Ms. Walker moved to Bath, Maine, to be closer to Ms. Bradley.

20.     Knowing that she could not disclose her relationship to others on the base due to

the DADT policy, Ms. Bradley spent much of her limited free time off base with Ms. Walker.

21.     On base, Ms. Bradley focused on learning her new job. Both on and off base, however, discrimination at the hands of both Navy personnel and civilian police contaminated her experience.

22.     In one incident on base, military police pulled over the car Ms. Bradley was riding in with Ms. Walker and two other women who were smoking cigarettes.

23.     A military police officer accused the four African American women of smoking marijuana and called for other military police officers to investigate the car with dogs.

24.     The dogs found no evidence of marijuana or any illegal activity and the police let Ms. Bradley and her friends go without a citation.

25.     Ms. Bradley believed that the police had targeted her and her friends as African American women.

26.     In another instance off base, an undercover police officer pulled Ms. Bradley over while Ms. Walker was teaching her to drive.

27.     The officer searched the car, spoke to the two women rudely, and called two police cars for backup for no apparent reason.

28.     Police took Ms. Bradley and Ms. Walker to the police station, where the women were held in cells for hours without arrest. Ultimately, the officers gave Ms. Bradley a ticket only for operating a vehicle without a license.

### *Harassment from an Officer in the Chain of Command*

29.     In a new and unfamiliar environment, Ms. Bradley tried to build community by finding a mentor whom she could look up to and who would provide her with guidance.

30.     She met Ensign Anthony S. Williams, an African American officer in her chain of command, at the hangar where she worked. Ensign Williams told Ms. Bradley that if she ever needed anything, she should come to him.

31.     Ms. Bradley was excited to meet Ensign Williams because he was one of few African Americans on base. She trusted that he would look out for her.

32.     One night about two months after Ms. Bradley arrived on base, Ensign Williams invited her to his barracks, a serious offense for an officer because of the power differential between him and his subordinates. There he guided her to his room, gave her a beer, and touched and rubbed her leg. Ms. Bradley was immediately uncomfortable.

33.     When Ensign Williams excused himself to use the bathroom, Ms. Bradley prepared to leave, but not before he emerged and pressured her to stay while touching her face. She refused his advances and left the room.

34.     Ms. Bradley was afraid and humiliated, and as a closeted gay woman she felt especially vulnerable.

35.     After the incident, Ensign Williams began to make unwelcome comments in the hallways. He would say words to the effect of "What happened?" or "You should come to the barracks again."

36.     Ms. Bradley felt betrayed and tried to avoid him as much as possible while still fulfilling her duties under his command.

### *Sexual Harassment Complaint*

37.     In summer 1995, Ms. Bradley worked up the courage to file a formal sexual

harassment complaint against Ensign Williams.

38.     Sexual harassment was pervasive at the time of Ms. Bradley's service. In a survey

of 90,000 active-duty service members conducted from February - September 1995, the

Department of Defense (DoD) found that 53 percent of female service members within the Navy

had experienced unwanted or uninvited sexual attention. *See* DEFENSE MANPOWER DATA

CENTER, 1995 SEXUAL HARASSMENT SURVEY 10 (1996) [hereinafter "DoD 1995 SURVEY"].

39.     The survey also found that, within the ranks of junior enlisted personnel, 83

percent of women across all of the service branches had experienced uninvited and unwanted

gender-related behavior. *Id.* at 15.

40.     But despite a 1993 instruction from the Secretary of the Navy that stated that "all

reported incidents of sexual harassment will be investigated," no Navy personnel followed up

with Ms. Bradley regarding her complaint. *See* DEPT. OF THE NAVY, OFFICE OF THE SECRETARY,

SECNAV INSTRUCTION 5300.26B 2 (Jan. 6, 1993) [hereinafter "INST. 5300.26B"].

41.      The Navy's failure to investigate Ms. Bradley's complaint was characteristic of

how the services handled sexual harassment allegations in 1995. The DoD survey found that, of

women who reported harassment, 39 percent indicated that no investigative or disciplinary action

resulted from their reports. *See* DOD 1995 SURVEY at 37.

42.     The Navy did not inform Ms. Bradley of any efforts to counsel Ensign Williams

and did not punish him for fraternization or for harassing her.

43.     After Ms. Bradley filed her sexual harassment complaint, a friend told her that

Ensign Williams had harassed other female service members in the Navy.

44.     Ensign Williams revealed that he knew of Ms. Bradley's complaint. He told her that she had "messed up" when she filed it and that she would regret her decision.

45.     Furthermore, his harassment of Ms. Bradley only escalated. After she filed the complaint, Ensign Williams would frequently insult her with sexual slurs and taunt her for being a failure who would not amount to anything in life.

### Post-Complaint Retaliation

46.     Almost immediately after filing the sexual harassment complaint, Ms. Bradley's interactions with her superiors on base became fraught and tense.

47.     Before filing the complaint, Ms. Bradley had had no formal disciplinary history in the Navy. After filing the complaint, however, the Navy began to change Ms. Bradley's work schedule frequently. For instance, command would assign her to grueling, alternating day and night shifts back to back.

48.     Her supervisors would wait until the last minute to inform her when she was working and often did not post her schedule in advance, as they did with other service members, and as they had done with Ms. Bradley before she filed her complaint.

49.     Ms. Bradley was constantly exhausted due to this changing schedule.

50.     Her command also began to target Ms. Bradley for minor disciplinary infractions.

51.     The Navy charged Ms. Bradley with a non-judicial punishment (NJP) for leaving her place of duty and watching a movie in the duty office on September 18, 1995; for being tardy to Captain's Call that same day; and for falling asleep on duty two days later.

52.     For these three minor issues, Ms. Bradley's command charged her with four violations of Articles 86 and 92 of the Uniform Code of Military Justice.

53.     On September 21, 1995, in response to the minor incidents described above and

an unpaid phone bill, Ms. Bradley's command gave her a Captain's Mast, an NJP.

54.     Her command reduced her in rate, and withdrew her recommendation for promotion. During her Captain's Mast, a member of her command also made a statement to the effect of "I promise I will get you out of the Navy."

55.     Following Ms. Bradley's Captain's Mast, her command quickly commenced actions leading to her administrative discharge.

56.     In October 1995, her command gave Ms. Bradley an administrative counseling.

57.     Her command also issued a 90-day restriction on base to Ms. Bradley and confined her to a barracks, punishments mainly reserved for people whom the Navy was going to discharge.

58.     Although Ms. Bradley had filed a formal sexual harassment complaint against Ensign Williams, her command did not bar him from visiting her during her restriction and taunting her with degrading statements such as "you aren't going to be anything" and "this was your only shot." Ms. Bradley understood these statements to be retaliation in response to her complaint.

59.     Ms. Bradley was twenty years old, just beginning her career, and Ensign Williams' behavior was particularly damaging to her wellbeing.

60.     In early November 1995, the Navy considered Ms. Bradley for administrative discharge.

61.     Despite Ms. Bradley's complaint, Ensign Williams, as a member of her chain of command, was involved in the decision to discharge her.  He served as a witness on documents related to her separation.

62.     In late November 1995, the Navy recommended Ms. Bradley for Administrative

Separation by reason of Misconduct due to Commission of a Serious Offense, despite her having had only a minor disciplinary record.

63.    The Navy discharged Ms. Bradley in January 1996 under Other-than-Honorable conditions.

64.    Ms. Bradley was looking forward to building a career and community in the Navy. After the Navy discharged her, however, Ms. Bradley had difficulty finding a new career path because she knew employers would view her discharge characterization negatively.

65.    Proud as she is of having served her country, Ms. Bradley was and still is embarrassed to share her experience of service, for fear that people will ask her about her discharge status.

### Board for Correction of Naval Records (BCNR) Application and Decision

66.    Ms. Bradley retained *pro bono* counsel and applied to correct her naval record through the Board for the Correction of Naval Records (BCNR) in spring 2016.

67.    Ms. Bradley did not dispute the underlying misconduct for which her command punished her and accepts responsibility for her mistakes in September 1995. She nevertheless explained that the lifetime stigma of an OTH was an error and injustice in light of the circumstances of her service and her discharge.

68.    In support of her application, Ms. Bradley submitted an affidavit to the BCNR that testified to her sexual harassment at the hands of Ensign Williams, her formal filing of a complaint against him, and his statement that she had "messed up" by filing it.

69.    Ms. Bradley's affidavit further testified to the social isolation she faced in the Navy due to discrimination on the basis of her race and sexual orientation.

70.    Khairah Walker corroborated Ms. Bradley's affidavit and testified to Ensign

Williams's sexual harassment of Ms. Bradley.

71.     On July 21, 2016, the BCNR rejected Ms. Bradley's application, concluding that her discharge was "proper as issued" (copy of BCNR Decision, attached as Exhibit A).

72.     Despite the sworn statements by Ms. Bradley and Ms. Walker, the BCNR found "no evidence in the record, and [Ms. Bradley] provided none, to support [her] assertions" of sexual harassment or discrimination. *Id.* at 2.

73.     The BCNR did not address Ms. Bradley's contention that her command took unfavorable personnel actions against her in reprisal for the sexual harassment complaint she filed against Ensign Williams.

74.     The BCNR did not address application of the Military Whistleblower Protection Act, 10 U.S.C. § 1034, to Ms. Bradley's case.

75.     The BCNR did not respond to Ms. Bradley's arguments that the Navy violated its own regulations by multiplying charges against her and by overcharging her for minor offenses, save by the conclusory pronouncement that "[t]he Board also was not persuaded by the mitigating assertion that your punishment was too harsh." Ex. A. at 2.

76.     The BCNR's decision did not address the United States Court of Military Appeals precedents cited by Ms. Bradley.

## STATUTORY AND REGULATORY BACKGROUND

77.     Congress has authorized the Secretary of the Navy, acting through the BCNR, to correct the discharge of any former member of the Navy. 10 U.S.C. § 1552.

78.     A Navy veteran may request a discharge upgrade from the BCNR to correct an error or injustice in her discharge characterization. 32 C.F.R. § 723.3. The application must be made within three years of the date of discharge, but the BCNR may waive the limitations period

"in the interest of justice." *Id.*

79.      The BCNR's decision must include "the reasons for the determination that relief

should not be granted, including the applicant's claims of constitutional, statutory and/or

regulatory violations that were rejected, together with all the essential facts upon which the

denial is based, including, if applicable, factors required by regulation to be considered for

determination of the character of and reason for discharge." *Id.* § 723.3(e)(4).

80.      The BCNR must also "make a determination as to the applicability of the

provisions of the Military Whistleblower Protection Act … if it is invoked by the applicant or

reasonably raised by the evidence." *Id.*

81.      In 1989, the Navy announced a "zero tolerance" policy pursuant to which

"[s]exual harassment is unacceptable conduct; it undermines the integrity of the employment

relationship, debilitates morale, and interferes with the work productivity of an organization.

Sexual harassment will not be tolerated at any level. Substantiated acts of or conduct which

results in sexual harassment shall result in corrective action." *See* DEPT. OF THE NAVY, OFFICE OF

THE SECRETARY, SECNAV INSTRUCTION 5300.26A (Aug. 2, 1989).

82.      In 1993, the Secretary of the Navy supplemented its zero tolerance policy with

Instruction 5300.26B, which defined "sexual harassment"; made clear that Navy personnel may

enforce the prohibition against sexual harassment through punitive, disciplinary, or

administrative action; and prohibited reprisal against individuals who provide information on

incidents of sexual harassment.  Furthermore, the Instruction stated that "*all* reported incidents of

sexual harassment will be investigated and resolved at the lowest appropriate level." INST.

5300.26B at 2 (emphasis added).

83.      At the time of Ms. Bradley's service in 1995, the Military Whistleblower

Protection Act protected individuals against unfavorable personnel actions or threats to take

unfavorable personnel actions in reprisal for making a report of "a violation of law or

regulation . . . prohibiting sexual harassment or unlawful discrimination." 10 U.S.C. § 1034.

84.     A veteran aggrieved by an agency action, including a final BCNR decision, may

seek judicial review pursuant to the Administrative Procedure Act. 5 U.S.C. §§ 702, 706.

## LEGAL CLAIMS

### Count I
### Administrative Procedure Act, 5 U.S.C §706(2)(A)
### Arbitrary and Capricious Agency Action

85.     The allegations of the preceding paragraphs are incorporated by reference as if

fully set forth herein.

86.     Defendant's 2016 denial of Mr. Bradley's applications for a discharge upgrade

and change of reason for separation constitute a final agency action.

87.     Defendant's own rules require it to determine whether the Military Whistleblower

Protection Act (MWPA) applies if it is "reasonably raised by the evidence." 32 C.F.R. §

723.3(e)(4); *see also* 10 U.S.C. § 1034.

88.     Ms. Bradley's evidence to the BCNR "reasonably raised" a claim under the

MWPA. The BCNR's failure to apply, let alone consider, application of the MWPA to Ms.

Bradley's evidence violated the MWPA and constitutes arbitrary and capricious agency action.

89.     The Board is also obligated by law to respond to all contentions raised by an

applicant in the materials submitted to it.

90.     When the Board failed to respond to each of Ms. Bradley's legal arguments,

particularly the claims raised by Ms. Bradley that the Navy violated its own regulations by

multiplying charges against her and by overcharging her for minor offenses, it acted arbitrarily

and capriciously.

91.    Defendant's 2016 decision, which did not cite any precedent in support of its

denial, was also arbitrary and capricious in failing to distinguish United States Court of Military

Appeals precedents cited by Ms. Bradley in support of her arguments.

92.    Defendant's 2016 decision was also arbitrary, capricious, unsupported by

substantial evidence, an abuse of discretion, and contrary to law, considered in light of the sexual

harassment and reprisal Ms. Bradley experienced; the severity of the punishment she received for

minor misconduct and the wrongful multiplication of charges against her; and the discrimination

and isolation she faced in the Navy as an African American gay woman.

**Count II**
**Administrative Procedure Act, 5 U.S.C §706(2)(C)**
**Ultra Vires Action**

93.    The allegations of the preceding paragraphs are incorporated by reference as if

fully set forth herein.

94.    Congress established that corrections shall be made under procedures established

by the Secretary concerned. 10 U.S.C. § 1552. BCNR regulations direct the Board to determine

whether "the evidence of record fails to demonstrate the existence of probable material error or

injustice." 32 C.F.R. § 723.3.

95.    The BCNR is not authorized by law to refuse to consider sworn statements

submitted by applicants as evidence of record.

96.    The BCNR is not authorized by law to require corroborating evidence in cases of

sexual harassment.

97.    The BCNR's assertion that there "was no evidence in the record and you provided

none, to support your assertions" of sexual harassment and discrimination ignores the sworn

statements by Ms. Bradley and Ms. Walker. Ex. A. at 2. This action was in excess of its statutory

authority and contrary to the regulations enacted by the Secretary.

**Count III**
**Fifth Amendment to the U.S. Constitution**
**Violation of Procedural Due Process**

98.     The allegations of the preceding paragraphs are incorporated by reference as if

fully set forth herein.

99.     The due process protections of the Fifth Amendment to the U.S. Constitution

require that federal administrative agencies conduct adjudications in a fair and orderly manner

when they deprive an individual of a property or liberty interest.

100.     A BCNR decision constitutes a government action.  The BCNR is under the

direction and supervision of the Navy for Manpower and Reserve Affairs and is governed by 10

U.S.C. §§ 1551-1557.

101.     Ms. Bradley has a liberty interest in having a correct and fair character of service

discharge classification and narrative description. Ms. Bradley's current OTH discharge

classification and narrative description, reading "Separation by Reason of Serious Misconduct"

carry with them significant reputational harm and, furthermore, impact Ms. Bradley's ability to

gain viable employment.

102.     The BCNR deprived Ms. Bradley of her liberty interest when it denied her a

discharge upgrade, and she is therefore entitled to procedural due process protections, which

require the BCNR to conduct adjudications in a fair and orderly manner.

103.     The Defendant did not conduct a fair adjudication of Ms. Bradley's discharge

upgrade application because the BCNR failed to provide Ms. Bradley with an individualized

review and a decisional document that articulated the reasons for her denial based on the

14

evidence presented.

104.    The Defendant did not conduct an individualized review when it failed to distinguish cases cited in Ms. Bradley's application.

105.    The Defendant did not conduct an individualized review when it neglected to acknowledge evidence in the record submitted in support of Ms. Bradley's claims.

106.    The Defendant did not conduct an individualized review when it failed to acknowledge or respond to Ms. Bradley's arguments regarding the unreasonable multiplication of charges.

107.    The Defendant did not conduct an individualized review when it denied Ms. Bradley's request to appear before the BCNR in Washington, D.C. in support of her application.

108.    The Defendant also failed to conduct a fair adjudication of Ms. Bradley's discharge upgrade application when the BCNR neglected to follow its own regulations.

109.    The Defendant's decision ignored its own rules when it failed to address the applicability of the MWPA even though a claim was "reasonably raised by the evidence." 32 C.F.R. § 723.3(e)(4).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1)    Order the Defendant to upgrade Ms. Bradley's discharge status to Honorable and to correct the narrative reason for separation;

(2)    In the alternative, order the Defendant to upgrade Ms. Bradley's discharge status to General Under Honorable Conditions and to correct the narrative reason for separation to "Other," or in the alternative, Secretarial Authority;

(3)    In the further alternative, hold unlawful and set aside the BCNR's 2016 decision,

and remand with instructions for further proceedings;

    (4)    Award reasonable attorneys' fees and costs; and

    (5)    Grant such other and further relief this Court deems just and proper.

Dated  March 27, 2017
New Haven, Connecticut

                                Respectfully Submitted,

                                By: /s/ *Michael J. Wishnie*
                                Alyssa Peterson, Law Student Intern[*]
                                Madeline Ranum, Law Student Intern[*]
                                Joshua Wilson, Law Student Intern[*]
                                Margaret Kuzma, Supervising Attorney[†]
                                Michael J. Wishnie, Supervising Attorney, ct27221
                                Veterans Legal Services Clinic
                                Jerome N. Frank Legal Services Organization
                                P.O. Box 209090
                                New Haven, CT 06520-9090
                                (203) 432-4800

---

[*] Motion for law student appearance forthcoming.
[†] Motion for admission to the District of Connecticut forthcoming.